TERESA C. CHOW (SBN 237694)
tchow@bakerlaw.com
ALEXANDER VITRUK (SBN 315756)
avitruk@bakerlaw.com
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:  310.820.8800
Facsimile:   310.820.8859

*Attorneys for Defendant*
MEMORIAL HEALTH SERVICES
d/b/a MEMORIALCARE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA MOORE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MEMORIAL HEALTH SERVICES d/b/a MEMORIALCARE,<br><br>Defendant. | Case No.: 2:22-cv-09468<br><br>[Los Angeles County Superior Court Case No.: 22STCV35388]<br><br>**DEFENDANT'S NOTICE OF REMOVAL**<br><br>Action Removed:   12/30/2022<br>FAC Filed:         12/12/2022<br>Action Filed:      11/07/2022 |

## NOTICE OF REMOVAL

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions MEMORIAL HEALTH SERVICES d/b/a MEMORIALCARE ("Memorial Health") has taken in connection with pursuing that directive. Memorial Health therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pp. 9-10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No.

2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, Memorial Health provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

1. Memorial Health is a California nonprofit public benefit corporation with its principal place of business at 17360 Brookhurst Street, Fountain Valley, CA 92708.

2. On November 7, 2022, Plaintiff Laura Moore filed a complaint against Memorial Health, in the Superior Court of the State of California for the County of Los Angeles, Case No. 22STCV35388.

3. Plaintiff served Memorial Health with the Complaint, effective on November 30, 2022.

4. On December 12, 2022, Plaintiff filed an Amended Complaint.

5. Plaintiff's three-count Amended Complaint purports to challenge Memorial Health's routine on-line practices as various invasions of privacy, including alleged violations of the California Invasion of Privacy Act, Cal. Penal Code § 631(a), Confidentiality of Medical Information Act Section 56.10, and California's Constitutional right to privacy. *See generally* Complaint.

6. Memorial Health operates a website, www.memorialcare.org, that among other things, provides information to the public about Memorial Health and allows patients to access their medical records through a Memorial Health patient portal.

7. Plaintiff alleges that she is or was a Memorial Health patient and "used www.memorialcare.org to search and locate physicians, schedule medical appointments, and find treatment options." Am. Compl. ¶¶ 3, 70. Plaintiff further alleges, "[o]n numerous occasions from 2016 to 2021, [she] accessed

www.memorialcare.org on her phone and desktop and used the website to look for health care providers" *Id.* at ¶ 11.

8. The Facebook Pixel is one of several "Business Tools" offered by Facebook[1] that "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services." Am. Compl. ¶ 26. Facebook offers the Pixel as a piece of code for website owners to integrate into their website to assist in advertising. *Id.*

9. Plaintiff does not assert that Memorial Health discloses names, social security numbers, diagnoses, birth dates or comparable information to third parties.

**BASIS FOR REMOVAL**

10. Memorial Health removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office …" *Id.* § 1442(a)(1).

11. The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and that defendants may remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a "colorable federal defense." *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 986–87 (9th Cir. 2019) (quoting *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018)).

---
[1] Facebook rebranded itself as Meta in 2021.

12. Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid programs (like Memorial Health) to offer patients online access to their medical records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

13. Memorial Health has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly construed, and because this suit implicates this federally-directed conduct, the requirements of the federal removal statute are satisfied.

### *The Meaningful Use Program*

14. In 2004, President Bush issued an Executive Order that established a National Health Information Technology Coordinator (ONC). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id*.

15. Five years later, Congress codified the office in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id*.

16. Consistent with its mandate, the ONC has published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "<u>collaborate with</u> . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf (emphasis added).  And, in the 2020-2025 plan, it noted that this has already happened, saying: "Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare." ONC, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic Plan").

17. One critical aspect of this strategy is CMS' "Meaningful Use" program. 42 C.F.R. § 495.2-495.370. As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records through the creation of patient portals.

18. Under this program, providers must meet certain criteria to receive full Medicare reimbursement, one of which is having an interoperable patient portal. Regulations provided for incentive payments of up to two percent for providers that reached certain levels of engagement with electronic health record use through the patient portal.

19. To achieve those specifications, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. The ONC has specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly." ONC has also specified "how a patient portal helps achieve meaningful use requirements," and how a provider can "actively promote and facilitate portal use."

ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013) available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

20. In addition to this guidance, CMS has created its own portal, offering what is essentially a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

### *Memorial Health Is A "Person"*

21. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

22. While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Arness v. Boeing N. Am., Inc.,* 997 F. Supp. 1268, 1272 (C.D. Cal. 1998); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992); *Overly v. Raybestos-Manhattan*, No. C-96-2853-SI, 1996 U.S. Dist. LEXIS 13535, at *7 (N.D. Cal. Sept. 6, 1996); *Malek v. Blackmer Pump Co.*, No. CV 15-04454 SJO (JEMx), 2015 U.S. Dist. LEXIS 97755, at *5 (C.D. Cal. July 24, 2015).

23. Memorial Health is a California nonprofit public benefit corporation, and since the federal officer statute is to be broadly construed, Memorial Health qualifies as a person under that statute.

### *There is a Causal Nexus Between Memorial Health's Actions and Plaintiff's Claims*

24. To demonstrate a causal nexus, the private person must show: (1) that the person was "acting under" a federal officer in performing some "act under color of federal office," and (2) that such action is causally connected with the plaintiff's claims against it. See *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–50 (9th Cir. 2017). The federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147–49, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007).

### *Memorial Health is Acting Under a Federal Officer*

25. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to *assist*, or to *help carry out*, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "detailed regulation, monitoring, or supervision." *Goncalves*, 865 F.3d at 1245 (citing to *Watson*, 551 U.S. at 152) (emphasis added).

26. Here these fundamental and liberally-construed requirements are easily met. The federal government is incentivizing, regulating, monitoring and supervising Memorial Health's actions in the Meaningful Use program in order to meet the federal government's national priority of interoperable health information technology.

27. First, Memorial Health (along with numerous other healthcare entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. In fact, Memorial Health was among the first health systems in the U.S. to implement an Electronic Medical Records (EMR) system, and it has actively participated in the federal Meaningful

Use program largely since the program's inception. As an early adopter, Memorial Health has qualified for and received meaningful use incentive payments under the program. Notably, the federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

28. Second, in the absence of Memorial Health's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscore, it would likely attempt to do exactly that.

29. Third, the government has specified how to best enhance patient engagement, including through a patient portal. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

30. Finally, the government has created an office dedicated to this issue and has closely monitored the work of private entities (like Memorial Health). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Memorial Health and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

31. In like circumstances, courts have liberally construed the "acting under" requirement, holding that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL 4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement

necessary for the federal officer removal statute); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

32. In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The *UPMC* court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, "UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria." *Id*. at *6. The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id*. at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." That low bar is clearly met here. Here, as in *UPMC*, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id*.

### *Plaintiff's Claims Relate to the Actions Under Color of Federal Office*

33. Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. As the *UPMC* decision shows, this requirement is liberally construed and easily met here. *UPMC*, 2020 WL

4381675, at *12 ("There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability.").

34. Plaintiff's Complaint directly challenges Memorial Health's website analytics practices, which promote "meaningful use" by helping to drive patients to the Memorial Health website and to the MyChart patient portal.

35. Plaintiff's Complaint also generally targets Memorial Health's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical website. The Meaningful Use program envisions these activities, as manifested by the federal government's own use of these codes and third parties for its Medicare website.

36. Indeed, as Plaintiff herself alleges, the entire point of using the third-party services is to direct traffic to, and increase engagement with, Memorial Health's website. For example, she alleges that Facebook Business Tools "are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms." Compl. ¶ 26. Likewise, she says that the "Facebook Tracking Pixel" helps to "track[] the people and type of actions they take." *Id*. ¶ 28.

***Memorial Health Raises Colorable Federal Defenses to Plaintiff's Claims***

37. The final requirement for removal under this statute erects a low bar and merely requires that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. Cal.*, 489 U.S. 121, 129-30 (1989); *see also Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

38. Defendant intends to assert several defenses, but by way of illustration and not limitation, there are at least two colorable federal defenses to the claims at issue here that satisfy this requirement.

39. First, in response to Plaintiff's repeated claims that "protected health information" was disclosed, Memorial Health will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). The Northern District of California has already made this holding in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

40. Second, to the extent that they ever could create a viable cause of action under California law, Memorial Health will argue that federal law preempts Plaintiff's common-law claims for alleged invasion of privacy. *See generally*, Am. Compl. ¶¶ 77-83.

41. Because each of the requirements of the statute are satisfied, removal to this Court is proper.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

42. Memorial Health satisfies all of the procedural requirements under 28 U.S.C. § 1446.

43. Memorial Health is filing this Notice of Removal within thirty (30) days of its receipt of the Complaint by "service," 28 U.S.C. § 1446.

44. Memorial Health files this Notice in the United States District Court of the Central District of California, because the State court in which the action is pending, the Superior Court of Los Angeles County, is within this federal judicial district. This Notice is signed pursuant to Federal Rules of Civil Procedure, Rule 11.

45. Memorial Health has attached hereto as **Exhibit "A"** a true and correct copy of "all process, pleadings, orders, and other documents," currently on file in the state court, including Plaintiff's Amended Complaint.

46. Upon filing this notice, Memorial Health will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the State court.

47. Pursuant to Federal Rule of Civil Procedure 7.1, Memorial Health is filing a Corporate Disclosure Statement concurrently with this Notice of Removal.

## **CONCLUSION**

As set forth above, Plaintiff's Complaint directly challenges practices and procedures Memorial Health has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Amended Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

DATED: December 30, 2022

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: */s/ Teresa C. Chow*
　　TERESA C. CHOW

*Attorneys for Defendant*
MEMORIAL HEALTH SERVICES
d/b/a MEMORIALCARE

## PROOF OF SERVICE

I, Nancy L. Brazil, declare:

I am employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90025-0509. On December 30, 2022, I served a copy of the within document(s):

**DEFENDANT'S NOTICE OF REMOVAL**

☑ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☑ by transmitting via electronic mail the document(s) listed above to the e-mail address(es) set forth below on this date and the transmission was reported as complete and without error.

| | |
|---|---|
| Tina Wolfson<br>Robert Ahdoot<br>Christopher E. Stiner<br>**AHDOOT & WOLFSON, PC**<br>2600 W. Olive Avenue, Suite 500<br>Burbank, CA 91505<br>Telephone:  (310) 474-9111<br>Facsimile:   (310) 474-8585<br>Emails:      twolfson@ahdootwolfson.com<br>                  rahdoot@ahdootwolfson.com<br>                  stiner@ahdootwolfson.com | *Attorneys for Plaintiff*<br>LAURA MOORE, on behalf of herself and all others similarly situated |
| Andrew W. Ferich<br>**AHDOOT & WOLFSON, PC**<br>201 King of Prussia Road, Suite 650<br>Radnor, PA 19087<br>Telephone:  (310) 474-9111<br>Facsimile:   (310) 474-4521<br>Email:       aferich@ahdootwolfson.com | |
| Gary M. Klinger<br>**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**<br>227 W. Monroe Street, Suite 2100<br>Chicago, IL 60606<br>Telephone:  (847) 208-4585<br>Email:       gklinger@milberg.com | |

Nick Suciu III
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3482
Facsimile: (865) 522-0049
Email: nsuciu@milberg.com

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on December 30, 2022, at Los Angeles, California.

_____
Nancy L. Brazil